[S. F. No. 68.   Department One.—August 3, 1896.]

JAMES CALLAN, RESPONDENT, *v.* JOHN C. BULL, APPELLANT.

NEGLIGENCE—MASTER AND SERVANT—BASIS OF LIABILITY—CONSTRUCTION OF JETTY FOR UNITED STATES—SUPERVISION OF ENGINEER OFFICER.— The liability of a master or contractor for the negligence of his servant rests upon his right to select the servant and control his work, or to select the materials to be used by such servant in his work; and where an employer entered into a contract for the construction of a breakwater or jetty on each side of the entrance to a bay, on behalf of the United States, the fact that the work was to be done under the supervision of an engineer officer in charge, who could prescribe the order in which the materials were to be placed, and give the lines of levels to be used, and could require the contractor to remove any person not acceptable to the United States, and that all material, supervision, and labor were to be subject to his approval, and that the work was to be done and materials furnished as directed by him, does not relieve the contractor from liability for the negligence of employees selected by him, while acting under his employment and direction, and with materials and appliances furnished by him for use in this work.

ID.—VICE-PRINCIPAL — NEGLIGENCE OF FELLOW-SERVANTS — PREPARATION OF APPLIANCES BY SERVANTS.—A superintendent employed by the contractor to represent him in the work, is his vice-principal or agent as respects the furnishing of suitable appliances which it is the employer's duty to furnish; but where the appliances are to be constructed or adjusted by the servants themselves out of materials furnished by the employer, all of the employees, including the superintendent, are fellow-servants, irrespective of rank, as to any defect or negligence in their construction or adjustment, and the employer is not liable for such defect or negligence.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order denying a new trial.   G. W. HUNTER, Judge.

The facts are stated in the opinion of the court.

*Buck & Cutler,* and *Frank McGowan,* for Appellant.

The government control of the work precluded liability of the contractor for negligence.   (*First Presbyterian Congregation* v. *Smith* (Pa. Oct. 1, 1894), 30 Atl. Rep. 281; *Cotter* v. *Lindgren,* 106 Cal. 602; 46 Am. St. Rep. 255; Wharton on Negligence, secs. 181–183; 2 Thompson on Negligence, 892, 909; *Byrne* v. *Kansas*

*etc. R. R. Co.*, 61 Fed. Rep. 607; *Powell* v. *Virginia etc. Co.*, 88 Tenn. 692; 17 Am. St. Rep. 925; *Railroad* v. *Hanning*, 15 Wall. 657.) The acts were performed by fellow-servants, the grade of employment being immaterial, and for such acts the contractor has no liability. (Civ. Code, sec. 1970; *Trewatha* v. *Buchanan etc. Co.*, 96 Cal. 494; *Noyes* v. *Wood*, 102 Cal. 392; *Stevens* v. *San Francisco etc. R. R. Co.*, 100 Cal. 554; *Livingston* v. *Kodiak Packing Co.*, 103 Cal. 258; *Lindvall* v. *Woods*, 41 Minn. 212.) The work of construction or adjustment, and selection of particular materials therefor, pertained to the duty of the employees, and the master is not responsible for their negligence in doing that work. (*Burns* v. *Sennett*, 99 Cal. 368; *Noyes* v. *Wood*, 102 Cal. 393; *Lindvall* v. *Woods, supra; Coal etc. Co.* v. *Clay*, 51 Ohio St. 542; *Fraser* v. *Red River Lumber Co.*, 45 Minn. 235; *Marsh* v. *Herman*, 47 Minn. 527; *Beesley* v. *Wheeler & Co.*, 103 Mich. 196; *Peschel* v. *Chicago etc. Ry. Co.*, 62 Wis. 338; *Benn* v. *Null*, 65 Iowa, 407; *Hogan* v. *Field*, 44 Hun, 72; *Ross* v. *Walker*, 139 Pa. St. 42; 23 Am. St. Rep. 160; *Colton* v. *Richards*, 123 Mass. 484; *Hogan* v. *Smith*, 125 N. Y. 774; *Butler* v. *Townsend*, 126 N. Y. 105.)

*Ernest Sevier*, and *Chamberlin & Wheeler*, for Respondent.

The supervision by the government did not relieve the contractor from liability. (*Hughes* v. *Railway Co.*, 39 Ohio St. 461; *Edmonson* v. *Railway Co.*, 111 Pa. St. 316; *Cuff* v. *Newark etc. Ry. Co.*, 35 N. J. L. 19; 10 Am. Rep. 205; *Eaton* v. *European etc. Ry. Co.*, 59 Me. 520; 8 Am. Rep. 430; *Schular* v. *Hudson River R. R. Co.*, 38 Barb. 653; *Callahan* v. *Burlington etc. R. R. Co.*, 23 Iowa, 562.) It is the duty of the master to furnish suitable appliances, and the servant has the right to assume that they are suitable; nor can the master rid himself of that duty. (*Magee* v. *Northern Pac. R. R. Co.*, 78 Cal. 437; 12 Am. St. Rep. 69; *Beeson* v. *Green Mt. etc. Co.*, 57 Cal. 29; *Illinois Cent. R. R. Co.* v. *Welch*, 52 Ill. 183; 4 Am. Rep. 593; *Kain* v. *Smith*, 89 N. Y. 375; *Ingerman* v.

*Moore,* 90 Cal. 410; 25 Am. St. Rep. 138; *Daves* v. *Southern Pac. Co.,* 98 Cal. 19; 35 Am. St. Rep. 133; *Burns* v. *Sennett,* 99 Cal. 363; *McNamara* v. *MacDonough,* 102 Cal. 575.)

HARRISON, J.—The plaintiff brought this action to recover damages for an injury sustained by him while in the employ of the defendant. The defendant in December, 1892, had entered into a contract with Major W. H. Heuer, of the corps of engineers, acting on behalf of the United States, for constructing a breakwater or jetty on each side of the entrance to Humboldt Bay, and in April, 1893, had hired the plaintiff as a laborer to work on the jetty. In constructing the jetty, trestlework was built out from the shore, on which was laid a double railroad track on which to carry rock and other material with which the jetty was to be formed. This trestlework was constructed of bents of piling sixteen feet apart, each bent consisting of four piles upon which a cap was fastened, and across these caps were laid stringers, upon which were placed the rails on which the cars were to run. Brush mattress work was constructed about the trestlework and sunk to the bottom of the sea, and on this brush work was deposited rock, thus forming a rip-rap embankment to constitute the jetty. The mode of laying the brush mattress was as follows: After some of the bents had been placed in position and the track laid thereon, a grillage of poles the width of the jetty, and varying in length from one to four bents, was laid beneath the bents, and bundles of brush placed thereon in alternate layers to the thickness of nearly four feet, on the top of which was laid another grillage of poles, and after these grillages had been secured the whole was dropped to the bottom and the rock afterward dumped thereon. During the construction of a mat it was suspended at each end by sling-poles hung from the bents, and on these sling-poles were laid the poles forming the bottom grillage of the mattress. After the north jetty had been built for the distance of

about a quarter of a mile from the shore; the defendant commenced to construct a spur on the outer side for its protection, and, for this purpose, placed a bent consisting of two piles and a cap, parallel to the main jetty, and about sixteen feet therefrom. These piles were driven sixteen feet apart, and on them was placed a cap thirty-two feet long. The defendant was directed to construct a mattress at this point twenty-four feet wide, measured in a direction parallel to the trestle, and as long from the trestle as it was practicable to make it from a single bent, the inner edge of the mattress being twelve feet inside of the spur-bent. For the purpose of sustaining this mat during its construction, two sling-poles about forty feet long were slung about eight feet under the cap and outside of the piles, the inner ends running in and resting upon the rock of the jetty already built and tied to the caps of the main trestle, and the outer ends suspended from the projecting ends of the cap on the spur-bent. Two stringers thirty-two feet in length were also laid across the cap of the spur-bent, one end of which was fastened to the end of the caps of the main trestle, and the other projected out over the spur-cap and sixteen feet beyond it. The northernmost of these stringers was placed with its center eighteen inches outside of the center of the pile, and to these stringers the sling poles were also suspended by steel cables at a point near their outer end. On August 12th, the next day after these stringers had been placed in position, the plaintiff, with other laborers, was engaged in laying the mat with the bundles of brush, and, after a few loads of brush had been placed thereon, the cap broke near its northern end, and a portion of that end of the cap fell upon the mat and struck the plaintiff, seriously injuring him. The jury rendered a verdict in favor of the plaintiff, and from the judgment entered thereon, and from an order denying a new trial, the defendant has appealed.

There was conflicting evidence upon the character of the timber, and also upon the amount of weight which

it bore, as well as the support which a sound stick of its size would bear; but, in view of the verdict of the jury, we must assume that the evidence showed that the weight of the mattress at the time it fell was too great for the sustaining force of the cap, either from its inherent defect or from the manner in which it was supported, and that there was negligence, either in the construction of the bent or in the mode in which the stringers were placed.

The contract of the appellant contained the following provision: "The work is to be executed under the supervision of the engineer officer in charge, or his agent, who will prescribe the order in which the materials are to be placed, and who will give the lines and levels to be used. No material, of any description, will be placed in the works without his knowledge and instructions at the time, and any materials so placed will not be paid for. The contractor must keep upon the work at all times responsible agents, who shall have full authority to carry out the instructions of the agent of the United States. The contractor shall remove from the work, at the request of the engineer officer in charge, any person who is not acceptable to the agents of the United States"; and also a provision that "all material, supervision, and labor furnished by the contractor will be subject to the approval of the engineer officer in charge." From these provisions, it is contended by the appellant that he was acting under the directions of the officers of the United States, and was but the agent or servant of the United States in the performance of the contract; that by the terms of the contract the United States reserved such control over the construction of the jetty as to deprive him of the power to select the mode of construction, or the laborers whom he would employ, and that, consequently, he is not liable for any injury resulting from following the directions of these officers, or for any fault or negligence in the manner of doing the work; and, further, that if there was any negligence in the performance of the work, which resulted in the in-

jury sustained by the plaintiff, it was the negligence of the fellow-servants of the plaintiff, for which he cannot be held responsible. On the other hand, the plaintiff contends that the defendant was bound to furnish to him a safe place in which to work, and safe appliances with which to do his work, and that he could not divest himself of this responsibility by intrusting to others, whether they be fellow-servants or not, the care of providing such appliances and place of work.

The master's liability for the negligence of his servant rests upon his right to select the servant and to control his work, but, when this selection and control rests in another, he is freed from such liability. The same principles govern the liability of a contractor for an injury resulting from the use of defective materials in his work. He can be held liable only when he has the right of selecting the materials. If he is to perform the contract with only such materials as may have been previously selected and furnished by his employer, he cannot be held liable for any defect in such materials. These principles are, however, subject to the rule that this right of selection and control is to be determined by the terms of the contract of employment, and that, unless by the contract this right is reserved to the employer, the contractor will be presumed to have the right of selection and control of all whom he employs. It is not enough that while performing the contract he may ask for and act upon the advice of his employer, or listen to his suggestions as to the mode of doing the work. Unless he is required to act according to his directions, he will not be released from liability to his employees for the consequences of his action, merely because he was so directed by the employer. He is not freed from this liability by a provision in the contract that the work is to be done " under the direction and to the satisfaction" of a superintendent (*Kelly* v. *New York*, 11 N. Y. 432), or " under the general supervision of the chief engineer of the company" (*Eaton* v. *European etc. R. R. Co.*, 58 Me. 520; 8 Am. Rep. 430), or "as

the engineer may. direct" (*Callahan* v. *Burlington etc. R. R. Co.*, 23 Iowa, 562), unless such provision extends to directing the manner in which the work is to be performed, rather than as to the results of the work. (*Cincinnati* v. *Stone*, 5 Ohïo St. 38.) The reservation by the employer of the right to remove any of the employees of the contractor does not relieve the latter from liability for the negligence of his employees. (*Reedie* v. *Railway Co.*, 4 Ex. 244; *Cuff* v. *Newark etc. R. R. Co.*, 35 N. J. L. 17; 10 Am. Rep. 205.)

The contract in the present case does not contain any provision by which the appellant was deprived of the power to employ such persons for the performance of the work as he might select. By the contract he was to supply all the materials, and perform all the labor necessary to construct the jetty according to the specifications which were annexed thereto, and he himself testified that he employed all the laborers engaged in the work, and furnished all the materials. These specifications prescribe the character of the materials to be used, and the only control or interference in reference thereto on the part of the United States provided in the contract was that such as did not conform to the specifications should be rejected; and there is no evidence that any of the material furnished by the appellant was ever rejected by any officer or agent of the United States, or that he was ever requested to remove from the work any person employed by him. The clause requiring the work to be executed under the supervision of the engineer officer, and authorizing him to prescribe the "order" in which the materials should be placed, and to "give the lines and levels" to be used, did not authorize any interference with the mode or manner of doing the work, but left that, as well as the men by whom it should be done and the means to be employed, under the control of the appellant. The further provision, that he should do the work or furnish the materials as he might be directed by the agent of the United States, refers merely to the quantity of material or place for the work

that was to be furnished or performed, according to the specifications named in the contract, and did not authorize any interference with the manner in which the work should be done. (*Pack* v. *New York*, 8 N. Y. 222; *Hughes* v. *Railway Co.*, 39 Ohio St. 475.)

Under the provision in the contract that "the contractor must keep upon the work at all times responsible agents, who shall have full authority to carry out the instructions of the agent of the United States," the appellant testified that he appointed one Butler, "as superintendent," and "as my representative to obey the instructions of the engineer in charge." Under this appointment Butler acted as the general superintendent of the work, and received orders from the appellant, and also from the representatives of the government. He had the right to hire and discharge men, but in fact the appellant himself hired all the laborers engaged on the work, and paid Butler as he paid the other men. The appellant does not appear to have been present at the work much of the time during its construction, or to have given any directions in reference thereto. The men employed upon the work were divided into several "crews" for different portions of the work—the mat crew, the pile-driver crew, the rock crew, and the apron crew—with each of which there was a foreman, and Butler was in charge of them all, giving directions to each as to the mode of the work and the place at which they were to work, directing the members of one crew to aid in the work of another, and himself at times helping in the work. Butler thus held varied relations in reference to the work to be performed, and also to the appellant and the other laborers. As the "responsible agent" of the appellant required by the contract to carry out the instructions on behalf of the United States, he fully represented the appellant. As superintendent in charge of the work he sustained a dual relation toward the other laborers. In respect to those duties from which the appellant could not be relieved by delegating their performance to another, he sustained toward them the character of

what is termed a vice-principal, and for his acts or omissions in the performance of these duties the appellant is as fully liable as if they had been performed by himself in person; but with reference to those acts in the performance of the contract which were not within the personal duties of the appellant, he was but the fellow-servant of the other employees.  His relation to them as superintendent of the entire work was the same with reference to these acts as that of the foreman of either of the crews with reference to its work.  They were all employed by the same employer in the same general business—the construction of the jetty—and for any negligence on the part of either of such fellow-servants the appellant is not liable.  (Civ. Code, sec. 1970.)  These men were none the less fellow-servants of the plaintiff by reason of being divided into different crews.  They were all in the service of the same common employer and engaged in the same business, each contributing to the completion of the work of constructing the jetty. It was shown that it was quite common for the men to be transferred from one kind of work to another.  At the commencement, and when the plaintiff was first employed, the men all worked together, but as the work advanced they were divided into crews for the better expedition of the work.  If one portion of the work was in advance of others, the men were taken from that as occasion might suggest, and placed at work upon other portions.  *Lindvall* v. *Woods*, 41 Minn. 212, presents many points in common with the present case.  In that case the defendants, while engaged in grading a line of railroad, conveyed the material taken from a cut to an adjacent fill by means of dumpcars laid upon a temporary trestle.  As the dump was filled the trestle was extended by raising additional bents and laying stringers thereon.  The different portions of the work were performed by different crews, and a foreman in charge of all of the men gave them directions what to do and where to work.  The ordinary employment of the plaintiff was on the dump, but it being desired to raise some

bents and extend the trestle, the foreman directed him to aid them, and while on the trestle it fell by reason of not being properly braced. The court held that the plaintiff was a fellow-servant, saying: "The work which the defendants were engaged in was grading a railroad, and they employed various servants in different departments of labor on that work, but all liable to be called upon the orders of the foreman from one department to another. All those engaged in these different departments bore to each other the relation of fellow-servants. They were all serving the same master, under the same control, and all engaged in the same general work. The thing to be done was the building of the road, and the co-operation of all the employees in each department was necessary to bring about that result." In *Fraser* v. *Red River Lumber Co.*, 45 Minn. 235, the defendant was engaged in manufacturing lumber, and had a number of employees, some of whom were engaged in piling green lumber and others in measuring and scaling it after it had dried. In piling the lumber, boards were projected for steps on which to go up and down the piles. The plaintiff had nothing to do with the piling, but while going up one of the piles of lumber, in the performance of his duty as measurer, he stepped upon one of the projecting boards which was defective and broke by reason of its defective nature, whereby he sustained injury. The court said: "All the men employed in this lumber-yard, whether pilers, scalers, sorters, or measurers, although engaged in different departments of the work, were all in the employment of the same master, under the same general control, and engaged in promoting the same common object. The making of the piles, including the projecting steps, was itself but a part of the work which these men were employed to perform, and all who were engaged in that yard, whatever the particular line of their service, were, as to each other, and as to every part of the common enterprise which they were promoting, 'fellow-servants.'"

The liability of the appellant is to be determined by

the character of the act through which the injury was sustained, or of his functions in reference to the act, and not by the rank or station of the employee under whose direction the act was performed. Where the negligence is in an act which the master must personally perform, the person to whom he delegates its performance is his agent, and the master is responsible for the negligence. If, on the other hand, it is in an act which may be delegated to another, or may be performed by an employee, the person by whom it is performed is a fellow-servant with the other employees, irrespective of his rank, and the master is not responsible to them for his negligence in its performance. (*Daves* v. *Southern Pac. Co.*, 98 Cal. 19; *Burns* v. *Sennett*, 99 Cal. 363; *Noyes* v. *Wood*, 102 Cal. 389; *Lindvall* v. *Woods, supra; McGinty* v. *Athol Reservoir Co.*, 155 Mass. 183.) Whether one acts as a fellow-servant, or as a representative of the master, is a question of law. (*Johnson* v. *Boston Tow Boat Co.*, 135 Mass. 209; 46 Am. Rep. 458.)

Among the personal duties of the employer which are recognized as binding upon him, even though the performance of the work is turned over to another, is that his employees shall have a safe place in which to work, and that the appliances with which the work is to be done shall be reasonably safe; and it is contended by the plaintiff that, in neglecting to provide a cap of sufficient strength to support the mat upon which the plaintiff was working at the time of his injury, the defendant failed to comply with this obligation. The rule which requires the master to provide a safe place and safe appliances for the servant is applied when the place in which the work is to be done is furnished or prepared by the master, as in the case of a ship or a mill or a factory, or when the machinery or other appliances with which the servant is employed to work are furnished by the master; but it has no application when the place at which the work is to be done, or the appliances for doing the same, are to be prepared by

the servant himself. If the appliance is furnished by the master for the purpose of enabling the servants to perform the work in which they are to be engaged, he is required to see that it shall be reasonably safe for that purpose; but, if the preparation of that appliance is a part of the work which the servant is required to perform, the master is not liable for any defect in its preparation. "The rule does not apply to a case where several persons are employed to do certain work, and, by the contract of employment, either express or implied, the employees are to adjust the appliances by which the work is to be done." (*Burns* v. *Sennett, supra.*) The work upon which the plaintiff was employed in the present case was to construct a jetty extending from the shore several thousand feet out into the waters of the bay. Manifestly, the place at which the work was to be done was not provided by the defendant, nor can it be said that different portions of the work in which the laborers might be engaged as it progressed was the "place" furnished by their employer, within the meaning of the above rule, or that the bent or trestle, from which was suspended the mat on which the plaintiff was at work at the time of his injury, was one of the appliances to be furnished by the defendant. On the contrary, the making of this bent was a part of the work to be done by the laborers themselves in the construction of the jetty, and the bent was in fact made by them out of materials furnished by the defendant. In *Coal etc. Co.* v. *Clay,* 51 Ohio St. 542, certain laborers in a mine were injured by the falling in of the roof, by reason of its not having been sufficiently propped; and, to the contention of the plaintiff that the employer became liable for the injury, on the ground that he had failed to furnish a safe place in which to work, the court said: "Here the place was not furnished as in any sense a permanent place of work, but was a place in which surrounding conditions were constantly changing, and, instead of being a place furnished by the master for the employees, within the spirit of the decisions referred to,

was a place the furnishing and preparation of which was in itself part of the work which they were employed to perform." In *Lindvall* v. *Woods, supra,* the court said: "The trestle was not a structure furnished by the'. defendants for their employees to work on, but was itself a part of the work which they were employed to perform.   It was a thing which they themselves made, and was as much a part of the construction of the road as was digging in the pit, loading cars, driving teams, or tamping dirt on the dump." (See, also, *Marsh* v. *Herman,* 47 Minn. 537; *Ling* v. *St. Paul etc. Ry. Co.,* 50 Minn. 160; *Peschel* v. *Chicago etc. Ry. Co.,* 62 Wis. 338; *Kelley* v. *Norcross,* 121 Mass. 508; *Beesley* v. *Wheeler,* 103 Mich. 196; *Butler* v. *Townsend,* 126 N. Y. 105.) In *McNamara* v. *MacDonough,* 102 Cal. 575, it was shown that the owner of the building had assumed the preparation of the scaffold upon which the plaintiff was at work.

The principle which controls in the present case is the same as that applicable in the construction of a house or other building, where the contractor agrees to furnish all the labor and materials requisite for its completion, and the carpenters, the plasterers, and the brick masons contribute their labor thereto.   All of his employees are fellow-servants, and the preparation of the scaffolds, ladders, staging, or other appliance for doing the different portions of the work, is within the scope of their employment.   The structure by which the mat on which the plaintiff was at work was suspended was, in substance, no more than an appliance for doing the work, in the nature of a suspended staging or scaffold, such as is frequently used by painters upon a building, and the preparation of this appliance was made by the workmen themselves.

There was testimony tending to show that the cap broke by reason of its own defects, and there was also testimony tending to show that it broke by reason of the defective mode in which the mat was suspended therefrom; that, if the stringers had been placed directly over the heads of the piles, instead of being placed out-

side of them, the strain of the mat's weight upon the cap would not have been sufficient to break it; but whether the cap broke by reason of its own defect, or by reason of the manner in which the stringers were placed upon it, is immaterial. It was selected and placed in position by the fellow-servants of the plaintiff, and the stringers were also placed upon it by his fellow-servants. If they were negligent or careless, either in selecting the piece of timber to be used as the cap, or in the manner in which the stringers were laid thereon, it was the negligence of a fellow-servant, for which the defendant is not liable. When the construction of the spur was determined upon, Butler directed some of the men to take a cap to the place where the spur was to be built, and the cap in question was taken from those lying at the landing, and carried there. Ditty, who belonged to the train crew, testified: "Butler told me to bring a cap out there. Jud Crane, who was on the car, went in with me, and we selected the cap and took it out. There were lots of other caps at the landing where we selected this one from." Larkin, the foreman of the pile-driving crew, placed the cap on the piles. Forbes, who was a member of the same crew with the plaintiff, helped to load the cap upon the car, and testified, also, that members of the mat crew, rock crew, and apron crew took part in adjusting the stringers and placing them across the cap. Hennegar, who was a member of the mat crew, and was also engaged in dumping rock, testified that he helped put the stringer on the cap, with the assistance of the rock crew and the mat crew.

Witnesses were called as experts on behalf of the plaintiff, for the purpose of showing that the structure to which the mat was suspended was not properly constructed to sustain the weight of the mat, and also to show what weight a cap of the dimensions of the one in question would sustain. These questions were objected to by the defendant, upon the ground that it was for the jury to determine, from the facts that might be

shown in the case, whether the structure was properly made. These objections were properly overruled. The matters sought to be shown by these witnesses—the weight of timber, the amount of strain to which a given piece of timber can be subjected before breaking, the difference of resistance to such strain between a cylindrical and a square piece of timber, and between different kinds of timber, the amount of weight that would be concentrated at the different points of the stringers at which the cables suspending the mat were attached—were matters not presumably within the common knowledge of men, and were eminently proper to be shown by those who had made these subjects a matter of special study. (*Prendible* v. *Connecticut River Mfg. Co.*, 160 Mass. 131.)

The judgment and order denying a new trial are reversed.

GAROUTTE, J., and VAN FLEET, J., concurred.

Hearing in Bank denied.